# CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Marcel Behnen, being duly sworn, depose and state that:

## Introduction

1. I am a Task Force Officer with the United States Drug Enforcement Administration ("DEA"), United States Department of Justice, and have been so employed since March 2019. I have been a police officer with the Kalamazoo Department of Public Safety for over 13 years, the last 5 of which I have been assigned as an investigator with the Kalamazoo Valley Enforcement Team ("KVET"), which is tasked with investigating narcotics trafficking. I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division.

2. During my time as a KVET Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, and reviews of taped conversations and drug records. I have also participated in investigations that included the interception of wire and electronic communications. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers.

3. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled

substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

4. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following electronic devices[1] and their contents:

    a. **Subject Device 2** – a black Apple iPhone 8, model A1863, in a black base, unknown IMEI, also described in Attachment A (hereinafter "**Subject Device 2**"). This device was seized from Jacobi WASHINGTON on January 15, 2022, and is currently in the custody of KVET in Kalamazoo, MI.

    b. **Subject Device 3** – a grey Alcatel, model A406DL flip-phone, IMEI 015695006867220, also described in Attachment A (hereinafter "**Subject Device 3**"). This device was seized from Jacobi WASHINGTON on January 15, 2022, and is currently in the custody of KVET in Kalamazoo, MI.

5. The applied-for warrant would authorize the forensic examination of **Subject Devices 2 & 3** for the purpose of identifying electronically stored data particularly described in Attachment B.

6. I respectfully submit that there is probable cause to believe that Jacobi WASHINGTON has committed the crime of possession with intent to distribute

---

[1] Investigators previously seized an Apple iPhone XS Max on July 19, 2021, from target Jacobi WASHINGTON, and examined it under the authority of a State of Michigan search warrant. In the context of this investigation that cell phone will be referred to as "**Subject Device 1.**"

controlled substances, in violation of 21 U.S.C § 841(a)(1). I further submit that there is probable cause to believe that evidence of this offense will be found on **Subject Devices 2 & 3**.

7. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested search of **Subject Devices 2 & 3** and does not set forth all of my knowledge about this matter.

## Background

8. On December 14, 2021, WASHINGTON was indicted by a Federal Grand Jury in the Western District of Michigan, case number 1:21-cr-00215. The indictment charged WASHINGTON with: Possession with Intent to Distribute Cocaine Base, Possession with Intent to Distribute Cocaine, Possession of a Firearm in Furtherance of a Drug Trafficking Crime, and being a Felon in Possession of Firearms & Ammunition. WASHINGTON's criminal history includes two previous convictions for drug trafficking offenses, including a conviction in the U.S. District Court for the Western District of Michigan for possession with intent to distribute cocaine base (*see* Case No. 1:11-cr-00277).

9. On the same date that the grand jury returned the indictment against WASHINGTON, a federal arrest warrant was issued for his arrest signed by U.S. Magistrate Judge Sally J. Berens.

10. The indictment stemmed from a longstanding KDPS investigation into WASHINGTON's drug trafficking activities. The investigation began in March 2021 when KVET investigators receiving information about WASHINGTON from a confidential informant. In May and July 2021, investigators conducted two controlled purchases of methamphetamine from WASHINGTON using the same confidential informant. The deals were set up by contacting WASHINGTON's cell phone number at the time – 269-532-6177.

11. Then, later in July 2021, investigators executed a search warrant at WASHINTON's residence. During the search, investigators recovered approximately 36 grams of crack cocaine from WASHINGTON's person as well as cash and a cell phone. Inside the house, they then found approximately 143 grams of cocaine, a small amount of methamphetamine, multiple digital scales, cash, and two firearms, as well as assorted ammunition and firearm paraphernalia.

12. Following the search, investigators obtained a State of Michigan search warrant to search the phone recovered from WASHINGTON's person ("Subject Device 1"). On the phone, they found evidence linking the phone to WASHINGTON. They also recovered numerous photos of him holding large amounts of currency, as well as videos of cash and guns, including one video with money and a Ruger handgun on his lap. They also found texts indicative of drug trafficking throughout 2020 and 2021. For example, in January 2021, WASHINGTON had a conversation with someone wanting 12 grams of "hard" (code for crack cocaine) and 2 grams of

"dog" (code for heroin). Then, in March 2021, Washington had a text exchange with a contact looking to buy a "ball" – code for an eighth of an ounce of drugs.

### Probable Cause

13. On January 15, 2021, KDPS Officer Jeffery Salmon initiated a traffic stop on a black Chevrolet Impala, bearing Michigan registration 7LMX49, for excessive tint and after observing indications that the driver was not wearing a seatbelt. The vehicle came a stop in the 500-block of William Street in the City of Kalamazoo.

14. Officer Salmon identified the driver as Jacobi WASHINGTON by his Michigan identification card. WASHINGTON was the only person in the car. WASHINGTON did not have a valid driver's license. Officer Salmon then checked WASHINGTON in the KDPS records database and located an alert to contact DEA TFO Marcel Behnen if contact was made with WASHINGTON, which he did. I informed Officer Salmon that WASHINGTON had a federal arrest warrant related to the aforementioned indictment.

15. Officer Salmon arrested WASHINGTON and searched his person incident to arrest. Officer Salmon found WASHINGTON to have two clear sandwich bags in his coat pocket, one of which had the corner torn off., which I know from my training and experience to be packaging consistent with drug dealing. Additionally, WASHINGTON had two unfilled out lottery tickets (also used in drug trafficking) in his coat and $260.00 US Currency on his person.

16.   KDPS K-9 Officer Max Houtman and his K-9 partner, Sledge, responded to the traffic stop and conducted a "free air" search on WASHINGTON's vehicle. K-9 Sledge gave a positive alert for the presence of controlled substances near the driver's door.

17.   Following the K-9 alert, officers conducted a search of WASHINGTON's vehicle. During their search, officers located:

   a.   Plastic baggie discarded in a Styrofoam cup in the center console.

   b.   Weighmax digital scale with white residue on the center console by the gear shifter.

   c.   Clear plastic baggie containing white chunk material concealed behind plastic siding of center console. (This was confirmed to be 58.56 grams of cocaine base by the KDPS Crime Lab. I know from my training and experience that 58.56 grams of cocaine base is consistent with a distribution level quantity and is not a quantity consistent with the personal use of narcotics.)



18. Officers also seized **Subject Device 2** from the center console of the vehicle and **Subject Device 3** from WASHINGTON's person.

19. WASHINGTON declined to speak with officers and was arrested on State of Michigan probable cause charges of Possession with Intent to Distribute Crack Cocaine as well as on the outstanding federal arrest warrant.

20. On January 18, 2022, WASHINGTON was turned over to the custody of the USMS in Grand Rapids, MI.

21. Based upon the investigation to date, I know that WASHINGTON uses his cell phone to conduct his illegal drug trafficking business.

22. More generally, based on my training and experience, I know that drug traffickers frequently use cell phones to conduct their drug trafficking business. For example, I have encountered drug dealers who use one cell phone/phone number to communicate with their suppliers and a separate cell phone/phone number to communicate with their customers. I have also encountered drug dealers who use one cell phone/phone number for certain customers and co-conspirators with whom they have long-standing relationships that the drug dealers therefore believe are more trustworthy and a separate cell phone/phone number to communicate with lesser known and lesser trusted customers.

14. Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices.

b. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices.

c. Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices.

d. Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking.

e. It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds. This evidence includes currency, financial instruments, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, and records concerning storage lockers. These and other items are maintained by the drug traffickers within their residences or other locations over which they maintain dominion and control.

f. That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency. In my training and experience, drug traffickers often maintain records related to their money laundering activities on their devices.

g. Drug traffickers commonly have in their possession, either on their person or at their residence, firearms. These firearms are used to protect and secure the proceeds and products of drug trafficking and the drug trafficker himself.

    h.    User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation; and

    i.    Drug traffickers often use the internet to look up various information to support their drug trafficking activities.

## Technical Terms

15.    Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can

contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-

       processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f.    IP Address: An internet protocol address (or simply "IP address") is a unique numeric address used by computers on the internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

16. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that **Subject Device 2 and 3** have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and/or PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

17. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

18. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that

might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Subject Device 2 and 3** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **Subject Device 2 and 3** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

    19. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of

**Subject Device 2 and 3** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

20. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

21. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Subject Device 2 and 3** described in Attachment A to seek the items described in Attachment B.